

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00043-CV

TARRANT REGIONAL WATER
DISTRICT

APPELLANT

V.

RICHARD JOHNSON AND
SHARKARA JOHNSON,
INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVES
OF THE ESTATE OF BRANDY
JOHNSON

APPELLEES

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 048-274121-14

----------

## OPINION

----------

This is an interlocutory appeal from the denial of a plea to the jurisdiction

based on alleged governmental immunity.  *See* Tex. Civ. Prac. & Rem. Code

Ann. § 51.014(a)(8) (West Supp. 2016).  In a single issue, appellant Tarrant Regional Water District (TRWD) contends that the trial court erred by denying its plea to the jurisdiction because the Texas Tort Claims Act (TTCA) does not waive its immunity from suit on the claims brought by appellees Richard and Sharkara Johnson.  We reverse and render in part and affirm in part.

**Background**

On January 16, 2013, the Johnsons' nineteen-year-old daughter Brandy Johnson tragically drowned in the Trinity River after apparently attempting to walk across Trinity Park Dam No. 2 (Dam No. 2) in Fort Worth on her way to a job interview.  That dam has a kayak chute in the middle through which the river rapidly flows.  After Brandy's death, the Johnsons sued TRWD, which "owns, operates[,] and maintains the systems of levees, sump areas, flood gate structures, channel improvements, river bottoms, low water weirs, dams, walkways[,] and kayak chutes on the Clear Fork" of the Trinity River in the area where Brandy drowned.  In their third amended petition, the Johnsons brought claims under the TTCA alleging that the following conditions constituted either a premises defect, a special defect, or both:  "Trinity Park Dam No. 2, the kayak chute on Trinity Park Dam No. 2, the levees, rock stairs and handicapped accessible walkway leading to Trinity Park Dam No. 2, the Clear Fork of the Trinity River, the river bottom of the Clear Fork of the Trinity River[,] and the large scour hole located at the base of Trinity Park Dam No. 2" (collectively the Premises).  They also alleged that (1) TRWD is liable under the TTCA for

2

negligence because an employee had used or misused tangible personal property or furnished Brandy with inadequate or defective tangible personal property and (2) TRWD was either grossly negligent or acted with malicious intent or bad faith. Finally, the Johnsons brought wrongful death and survival causes of action.

TRWD filed a plea to the jurisdiction alleging that its immunity had not been waived under the TTCA for any of the Johnsons' claims because (1) the Johnsons did not identify any item of personal property allegedly used or misused by an employee, (2) as a matter of law, the Premises are not a special defect, and (3) even if the Johnsons alleged a premises defect for which its immunity is waived, the TTCA reinstates that immunity because its decisions regarding the design of the Premises and any related safety features, such as warning signs, are discretionary. Alternatively, TRWD argued that if (3) above does not apply, the Johnsons still cannot maintain a premises defect claim because they (a) failed to identify a premises defect that created an unreasonable risk of harm, (b) even if they alleged an actionable defect, there is no evidence it caused Brandy's death, (c) the kayak chute and water running through it are an open and obvious danger, and (d) if TRWD had a duty to warn Brandy, as a matter of law it did so adequately. The trial court denied the plea to the jurisdiction.

3

## Standard of Review

We review the trial court's ruling on a plea to the jurisdiction under a de novo standard of review. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *City of Wichita Falls v. Jenkins*, 307 S.W.3d 854, 857 (Tex. App.—Fort Worth 2010, pet. denied). The plaintiff has the burden of alleging facts that affirmatively establish the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Eden Cooper, LP v. City of Arlington*, No. 02-11-00439-CV, 2012 WL 2428481, at *3 (Tex. App.—Fort Worth June 28, 2012, no pet.) (mem. op.). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Miranda*, 133 S.W.3d at 226. Whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is a question of law. *Id.*; *Jenkins*, 307 S.W.3d at 857.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227; *Jenkins*, 307 S.W.3d at 857. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Miranda*, 133 S.W.3d at 227–28; *Jenkins*, 307 S.W.3d at 857. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter

4

of law.  *Miranda*, 133 S.W.3d at 228; *Jenkins*, 307 S.W.3d at 857.  This standard generally mirrors that of a traditional summary judgment.  *Miranda*, 133 S.W.3d at 228; *Jenkins*, 307 S.W.3d at 857; *see* Tex. R. Civ. P. 166a(c).

## Waiver of Immunity Under TTCA

Generally, a governmental unit enjoys immunity from lawsuits for damages.  *See City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008); *City of Haltom City v. Aurell*, 380 S.W.3d 839, 844 (Tex. App.—Fort Worth 2012, no pet.).  An assertion of governmental immunity to suit is a challenge of the trial court's jurisdiction.  *Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009); *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007).

The legislature has provided a narrow waiver of immunity in the TTCA. *Reed*, 258 S.W.3d at 622; *Haltom City*, 380 S.W.3d at 844.  A cause of action must initially meet the requirements set forth in section 101.021 of the TTCA to come within its waiver of governmental immunity.  Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (West 2011); *Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 805 (Tex. App.—Fort Worth 2008, no pet.).  Under section 101.021, governmental units are liable for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2).  "Liability for premises defects is implied under section 101.021(2) because a premises defect arises from a

5

condition existing on real property." *Haltom City*, 380 S.W.3d at 845 (quoting *Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.)).

But even if a plaintiff has pleaded claims for which immunity is waived under section 101.021, the TTCA nevertheless contains specific exemptions from that waiver. *Univ. of Tex. at San Antonio v. Trevino*, 153 S.W.3d 58, 61 (Tex. App.—San Antonio 2002, no pet.). Section 101.056 of the TTCA exempts from section 101.021's waiver of immunity a "governmental unit's decision not to perform an act[,] or . . . its failure to make a decision on the performance or nonperformance of an act[,] if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit." Tex. Civ. Prac. & Rem. Code Ann. § 101.056(2) (West 2011); *Brazoria Cty. v. Van Gelder*, 304 S.W.3d 447, 453 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Whether a governmental activity is discretionary for TTCA purposes is a question of law. *State v. San Miguel*, 2 S.W.3d 249, 251 (Tex. 1999).

"An act is discretionary if it requires exercising judgment and [if] the law does not mandate performing the act with such precision that nothing is left to discretion or judgment." *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999), *overruled on other grounds by Denton Cty. v. Beynon*, 283 S.W.3d 329, 331 n.11 (Tex. 2009). The supreme court has articulated two tests for determining whether conduct by a governmental entity involves a discretionary function: the first test distinguishes between policy-level decisions, for which immunity exists, and operational-level decisions, for which there is no immunity; the second

distinguishes between the design of public works, for which there is immunity, and their maintenance, for which there is no immunity. *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 657 (Tex. 2007). Operational or maintenance level decisions are those involved in carrying out a policy, consisting of ministerial acts that require obedience to orders; by contrast, policy decisions are those taken at the planning level that constitute the execution of or the actual making of those policy decisions. *Tex. Dep't of Transp. v. Hathorn*, No. 03-11-00011-CV, 2012 WL 2989235, at *6–7 (Tex. App.—Austin July 19, 2012, no pet.) (mem. op.). And because "the '[d]esign of any public work, such as a roadway, is a discretionary function involving many policy decisions, . . . the governmental entity responsible may not be sued for such decisions.'"[1] *Tex. Dep't of Transp. v. Perches*, 388 S.W.3d 652, 655 (Tex. 2012) (quoting *Rodriguez*, 985 S.W.2d at 85); *Brazoria Cty.*, 304 S.W.3d at 454. Additionally, a court should not second-guess a governmental unit's decision about the type of marker or safety device that is the most appropriate. *San Miguel*, 2 S.W.3d at 251.

Because TRWD's first contention in the trial court and here is that even if its immunity from the Johnsons' claims is initially waived under section 101.021, it would still be immune because of section 101.056's applicability, we will first

---

[1]Although many of the discretionary design cases relate to roadway design, they are not limited to roadway design. *See Univ. of Tex. v. Amezquita*, No. 03-06-00606-CV, 2009 WL 1563533, at *2 (Tex. App.—Austin June 4, 2009, no pet.) (mem. op.).

review whether the Johnsons' claims relate solely to discretionary functions for which TRWD's immunity would not be waived under the TTCA.

## Specific Allegations in the Johnsons' Third Amended Petition

The Johnsons alleged in their live pleading that the kayak chute cut into the middle of Dam No. 2, like the chutes in two of the other dams in the same area of the Trinity River, "allow[s] for water to flow through at rates of at least up to 2,700 cubic feet per second." They also alleged that the chute is "made of an exposed aggregate pea gravel concrete mix, is approximately 10 feet across[,] and is smooth, slick and slippery, especially with water running through the chute." They further alleged that the chute in Dam No. 2 "creates a Class II+ whitewater rapid."

The petition also claimed that there is a "huge scour hole" at the base of Dam No. 2 that "creates a channel bottom that was up to nine feet deeper than expected or designed" and that in 2003, the scour hole "was partially but not completely filled with loose materials and construction materials and the materials were not sealed in place." At some point, "[t]he loose materials were washed out of the scour hole, likely in 2007 during some flooding and 'high flow velocity' events [and were] . . . pushed far downstream and even created a small artificial island downstream from" Dam No. 2. According to the Johnsons, Brandy drowned when she fell from the kayak chute into the scour hole, which was not visible to Brandy and was "as large as it originally was when negligently repaired in 2002." The petition states, "The depth of the river at the downstream

8

base of . . . Dam No. 2 is supposed to be three feet," and alleges that if Brandy had fallen into the river at that depth, she would have been able to stand up and would not have drowned. The Johnsons also alleged that after Brandy's death, TRWD had approved plans to "fix the scour hole, seal the material being placed in the scour hole[,] and return the river depth back to the original three foot depth."

The Johnsons further detailed three previous drownings and two near drownings at the same site, all involving people falling off the dam. They also noted that allegations had been made in some of those cases that although the dam had signs on it, those signs did not warn of any dangers. The Johnsons alleged that no additional or better warning signs were added after these incidents. Additionally, the Johnsons alleged that a cyclist who successfully saved Dania Martinez's son, but who could not rescue Martinez, told CBS 11 news, "It looks completely harmless . . . but that little waterfall and then there's a little sinkhole. You're pulled down and then you're being pushed this way and down. When I got to him, I had to reach down, he was starting to go under and had been bobbing up and down." According to the cyclist, she had been swimming "almost her entire life," but she found it difficult to keep her head above water. The Johnsons further alleged that in March 2012, TRWD considered placing new warning signs on Dam No. 2 in response to the three drownings and at least one of the near drownings. While two designs were considered—one of which showed an arrow through water and said "Beware Strong Currents" and

9

the other of which showed the top of a person's head and a waving arm over water stating "STRONG CURRENT YOU COULD BE SWEPT AWAY FROM SHORE AND COULD DROWN IF IN DOUBT DON'T GO OUT"—the final approved design showed the top of a person in water, with a person standing in front stating "SAFETY FIRST PLEASE WATCH YOUR CHILDREN." According to the Johnsons,

> This sign was created and designed by a public relations person. No safety studies occurred. No contact was made with the designer of the walkways to see if they could be made safer. No expert was consulted on making the artificially created condition safer. Nothing occurred except the placement of one poorly designed sign in which the word caution had been intentionally removed.

In general, the Johnsons alleged that the "artificially created condition created by" Dam No. 2, "the scour hole and the . . . slippery kayak chute," and the walkways, river, and channel bottoms were dangerous conditions and that TRWD "did not have adequate safety and warnings signs" at the dam. According to the Johnsons, TRWD was actually aware of these dangerous conditions, including that the scour hole that was supposed to be three feet in depth was actually eleven to twelve feet in depth. Moreover, they allege TRWD was actually aware "of the numerous drownings or near drownings" at Dam No. 2 and that Dam No. 2 "had more drownings or near drownings than any of the other twenty-three to twenty-five dams that TRWD oversees." Finally, they contend that TRWD was aware "that it was dangerous for the general public to walk across [Dam No. 2] when there was water flowing through the kayak chute."

10

The Johnsons contended that the defective condition of Dam No. 2 was caused by "altering the natural flow of the Clear Fork of the Trinity River by diverting the river through a series of artificial man made dams and kayak chutes," creating "a smooth looking yet powerful and deceptively dangerous current through the kayak chute" and "re-creat[ing] a large scour hole": "If the large scour hole[,] which was created by the artificial diversion of the natural flow of the water, had been properly repaired or maintained, Brandy . . . would have been able to stand up in the Clear Fork of the Trinity River." Furthermore, the Johnsons claim that TRWD negligently implemented policy and negligently maintained the Premises by not "filling in or repairing the large scour hole," filling it in improperly, or both, and by negligently constructing Dam No. 2 and the surrounding area. Finally, the Johnsons allege that TRWD was negligent in failing to manufacture the more explicit warnings signs proposed and considered by TRWD in 2012, before Brandy's death, and in failing to "secure the area to prohibit access to the unsafe conditions."

**The Johnsons' Complaints About the Parts of the Premises Other Than The Scour Hole and Resulting "Boil Effect" Relate Only to Discretionary Design Decisions[2]**

*Relevant Facts*

The following evidence about the Premises was developed during the plea to the jurisdiction pleading process. The United States Army Corps of Engineers is jointly responsible with TRWD for regulating and maintaining flood control along the Trinity River in Fort Worth. In the 1960s, the Corps channelized this part of the river and strengthened existing levees to assist in flood control. Part of the channelization included the establishing of a grade for the river bottom to facilitate river flow. As a result of the river channelization project, several dams were constructed by TRWD. Dam No. 2, the dam at issue here, included a fishing pier on the west side; in the 1970s, TRWD designed and installed rock stairs leading down to the river on Dam No. 2. In the 1980s, TRWD installed a handicapped accessible sidewalk ramp from adjacent Trinity Park down to the dam.

According to TRWD's Dam and Levee Safety Engineer, Louis Verreault, the original dams in this location were vertical face dams. Over time, those types

---

[2]TRWD contends in its reply brief that the Johnsons "narrowed" their claims on appeal by responding with arguments only about the scour hole, undertow and resulting boil effect, and the current through the kayak chute; however, because the applicable standard of review requires us to consider whether TRWD was entitled to a dismissal of the Johnsons' pleaded claims, we will consider TRWD's preserved appellate arguments as to the Johnsons' entire petition in light of the appropriate standard of review. *See Miranda*, 133 S.W.3d at 226–27.

of dams will move sediment from the river channel bottom downstream in a "scouring" effect due to the force of the water flowing over the dam and then straight down toward the river bottom.

In 2002 and 2003, TRWD redesigned and reconstructed several dams, including Dam No. 2, for recreational purposes. The design for Dam No. 2 included a kayak chute in the middle of it for use by recreational kayakers and inner tubers. Construction began in 2003 and consisted of the removal of the dams built in the 1960s and the rebuilding of new dams. According to Verreault, the new dam, Dam No. 2, was "designed to retain water and to control erosion and is not designed as a walkway."

Verreault's job during the dam redesign was to ensure its structural integrity. As part of the design process for the kayak chute, TRWD had to demonstrate to the Army Corps of Engineers that the chute would not impact the overall flow of the river so as to comport with the Corps' plan for flood prevention.

The kayak chute in the middle of Dam No. 2 is a ten foot opening through the center of the dam and consists of "running water running over a slippery surface." The kayak chute was intentionally designed to be slippery so as to facilitate the movement of kayaks and small boats through it from one pool of the river to the next. The bottom is made of exposed pea gravel that was chosen to be "smooth and slick." TRWD relied on the designer of the chute to make sure it would be safe for kayakers. However, Verreault admitted that TRWD did not take measures to ensure the safety of people walking across the kayak chute

13

because it was not intended as a walkway. Verreault did not believe the dam was unsafe, but he did agree that walking on it could be dangerous.

Verreault estimated that the flow of the river on the day of Brandy's death was two to five hundred cubic feet per second. The velocity of the water running through the chute, however, would have been faster than the overall flow of the river because all of the water would be concentrated through that ten-foot opening. Verreault estimated that the water moving across the chute on the day of Brandy's death was six inches deep, which, at the speed it was moving, could cause someone to fall. On that day, the water flowing through the chute did not reach across its entire ten foot width; according to Verreault's testimony, "it appears that there was very low flow through the center chute, because it's all contained within the center chute and doesn't cover it from side to side, so my assumption is that it's at a lower flow."

When Dam No. 2 was installed, TRWD did not install warnings regarding the danger of the water speed or flow in the chute, but it did embed signs in the rock approaching the kayak chute on each side of the chute with a depiction of a figure walking with a line through it. At the time of Brandy's death, another set of signs had been posted on either side of the kayak chute on Dam No. 2 that said, "SAFETY FIRST PLEASE WATCH YOUR CHILDREN," along with a picture of a small figure in water with an arm above its head. According to Darrell Beason, Director of Operations for TRWD, at the time, there had been drownings of children or of people attempting to rescue children who had fallen in the river, so

14

TRWD thought the reason that there had been several such incidents was related more to unsupervised children than an issue with the adequacy of warnings against walking through the kayak chute.

After Brandy's death, TRWD posted warnings regarding the strong current on social media and in the *Fort Worth Star-Telegram*. TRWD also placed new signs on Dam No. 2 after Brandy's death; since that time until at least August 20, 2015, the date of Beason's deposition, there had not been any drownings at Dam No. 2. In August 2015, the TRWD Board approved widening the chute to twenty-five feet; TRWD also planned to place rubber baffles around the chute to discourage walking across the chute.

However, TRWD was aware as early as 2003 that people were walking "all over" Dam No. 2. The stairs down to the dam were installed to facilitate fishermen and people launching kayaks and inner tubes: the stairs are for the purpose of "bring[ing] people down [to the river] to recreate . . . [and] contact . . . the river." Likewise, the fishing pier was already existing in 2002; as part of the redesign of Dam No. 2, TRWD connected the stairs and dam up to the pier.[3]

Each year, TRWD visually inspects the dams, including Dam No. 2, with a Corps engineer to see if they have been damaged or if any repairs are necessary. As part of TRWD's annual visual inspection of the dams, it checks the warning signs to make sure they are not damaged or obscured by debris.

---

[3]Neither of these points of access or use required walking across the chute.

*Analysis*

All of the evidence supports the conclusion that the condition of the kayak chute about which the Johnsons complain—that its surface was smooth and slippery and that a dangerous, swift current ran through it—is an intentional result of the chute's design and not a malfunction of the chute or TRWD's failure to maintain it. The evidence shows that the chute was designed to be ten feet wide and have a slippery surface on the bottom over which running water would flow at a velocity sufficient to move kayaks and small boats across it. Additionally, the evidence shows that the rest of the Premises other than the scour hole and alleged related boil effect—the stairs, pier, and parts of Dam No. 2 other than the kayak chute—were constructed in accordance with the design of intentionally bringing people down to the river to fish or launch boats.

This evidence shows that the allegations regarding the condition of Dam No. 2, including the kayak chute and the remainder of the Premises other than the scour hole and boil effect are complaints about the design of Dam No. 2 rather than the maintenance of Dam No. 2 contrary to the original design. *See Mogayzel v. Tex. Dep't of Transp.*, 66 S.W.3d 459, 465–66 (Tex. App.—Fort Worth 2001, pet. denied) ("[A]lthough Appellants pled that Appellees had notice of I–20's dangerous condition and failed to correct it within a reasonable time, they have not alleged that the dangerous condition came about through a negligently implemented policy or plan. Rather, Appellants complain of the condition of I–20 as it was *originally designed*."). Accordingly, the Johnsons'

16

claims about those conditions are barred under section 101.056 of the TTCA. *See City of Austin v. Frame*, No. 03-15-00292-CV, 2016 WL 3068379, at \*5 (Tex. App.—Austin May 27, 2016, no pet.) (mem. op.) (holding that failure to construct guard rail or barrier separating road from trail to protect users of trail from road hazards required "the City to balance social and economic concerns and devise a plan to address each specific identified hazard" and that the complaint that the City should have addressed a specific hazard by erecting a guardrail or barrier "is ultimately a complaint about how the City chose to allocate its resources," which is "exactly the sort of policy formulation and balancing of interests that the discretionary-powers exception is meant to protect"); *Hathorn*, 2012 WL 2989235, at \*8 ("Even taking the evidence in the light most favorable to Hathorn, the non-movant, it is clear that the negligence alleged by Hathorn arose not from faulty implementation of the plans, but from TxDOT's policy decision about the roadway's design.").

Likewise, the Johnsons' complaint about the adequacy of the warning signs—their placement, content, or both[4]—is a complaint about the decision of whether or not to install safety features, which is barred by section 101.056. *See Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002); *Frame*, 2016 WL 3068379, at \*6 (holding that complaint about City's failure to install protective

---

[4]This includes the Johnsons' complaint that TRWD negligently implemented a policy to add new signs because it did not approve and implement an initial design for signs with a clearer warning.

17

barrier or guardrail was "in essence, a complaint about the City's alleged decision not to modify the existing design of its public works" and complaint of failure to change a design to make it safer was nevertheless a complaint related to design). A complaint about the adequacy and efficacy of safety devices such as warning signs is a complaint about discretionary design, for which immunity is not waived. *San Miguel*, 2 S.W.3d at 251 ("A court should not second-guess a governmental unit's decision about the type of marker or safety device that is the most appropriate."); *Tex. Dep't of Transp. v. Olivares*, 316 S.W.3d 89, 100–01 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *cf. Tex. Dept. of Transp. v. Bederka*, 36 S.W.3d 266, 271 (Tex. App.—Beaumont 2001, no pet.) (holding that the "Department enjoys immunity from suit regarding its decision to place a particular traffic control signal, *even if the signal fails to make the premises safe* [and that the] selection of the device employed is not its condition" (emphasis added)), *disapproved of on other grounds by City of Grapevine v. Sipes*, 195 S.W.3d 689, 695 n.5 (Tex. 2006). Accordingly, we conclude and hold that the Johnsons' claims regarding the signs' allegedly inadequate warnings as creating an unsafe condition are barred by section 101.056.

The Johnsons contend that a different result is compelled by virtue of the reasoning in *Texas State University-San Marcos v. Bonnin*, No. 03-07-00593-CV, 2010 WL 4367013 (Tex. App.—Austin Nov. 5, 2010, no pet.) (mem. op.). In that case, a young man died after jumping from the balcony of the restaurant where he worked into the waterway at Spring Lake Dam on the university's campus. *Id.*

18

at *1.  His parents sued the university, pleading that his death was the result of a turbulent undertow that pulled him into underwater caverns beneath the restaurant.  *Id.*  According to the Bonnins' petition, the university had created an unreasonably dangerous condition as a result of making repairs to the waterway at the location where their son died and failing to block access to, or warn others about, the underwater caverns.  *Id.*  The Austin Court of Appeals held that section 101.056 barred the Bonnins' claims regarding the creation of the condition and failure to warn, holding that those allegations were not based on the argument that the university had failed to maintain the waterway after the repairs were made but, rather, they attributed the Bonnins' son's death to "the initial design decisions regarding the repairs."  *Id.* at *2.

However, the court went on to address a separate claim in the Bonnins' petition:  that under the Recreational Use statute, the University had allowed a defective condition on the property—a dangerous undertow existing apart from, and not created by, the design of the underwater caverns—when it "knew . . . or should have known [that] the property would be used for recreational purposes."  *Id.* at *3; *see* Tex. Civ. Prac. & Rem. Code Ann. § 75.001–.007 (West 2011 & Supp. 2016) (commonly known as the Recreational Use statute).  The Recreational Use statute neither creates liability nor waives sovereign immunity; instead, it further "limits the liability of a governmental unit under circumstances in which the governmental unit would be liable under" the TTCA.  *Suarez v. City of Texas City*, 465 S.W.3d 623, 632 (Tex. 2015) (quoting in part and citing Tex.

19

Civ. Prac. & Rem. Code Ann. § 75.003(d)–(g)). In *Bonnin*, the court addressed the complaints as pleaded by the Bonnins; here, the Johnsons did not plead any claims under the Recreational Use statute, nor could they rely on it to pursue claims not otherwise allowed under the TTCA. *See id.*; *cf. Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 51 (Tex. 2015) (considering whether Recreational Use statute, which applies to "activit[ies] associated with enjoying nature or the outdoors," applied to the act of attending and observing a competitive sports game). Accordingly, the reasoning in *Bonnin* does not apply to except the Johnsons' claims regarding the parts of the Premises, other than the scour hole and boil or undertow and related current,[5] from section 101.056's reinstatement of TRWD's immunity.

Ultimately, the Johnsons argue that there is a difference between designing a dangerous condition on real property and allowing such a dangerously-designed condition to continue unabated. However, the case law does not stand for that proposition. Instead, the holdings are clear that if an alleged real property condition is a result of a *discretionary* design decision—in

---

[5]The Johnsons appear to use the phrase "deceptively dangerous current" interchangeably in their petition and brief, either to refer to the water running through the kayak chute or the current creating the boil or undertow effect as evidenced by the larger scour hole. Because there is no evidence that the water running through the kayak chute was not functioning as designed, we limit our discussion in the next section to the Johnsons' allegations about a "deceptively dangerous current" to the extent that it can be construed as pertaining to the alleged boil effect at the base of and immediately downstream from Dam No. 2. *See Miranda*, 133 S.W.3d at 226 (instructing court to liberally construe pleadings).

other words, no law mandates a certain or different design—rather than the result of the failure to properly maintain the real property as designed—even if the result of the discretionary design decision is the creation of an allegedly dangerous condition—then the governmental entity's immunity is reinstated, and therefore not waived, under section 101.056 of the TTCA. *See, e.g.*, *Haltom City*, 380 S.W.3d at 845–46 ("To prevail on a premises defect claim under the TTCA, a plaintiff must prove that the condition of the premises created an unreasonable risk of harm."); *Mogayzel*, 66 S.W.3d at 465–66.

**The Complaints Regarding the Deepening of the Scour Hole and Evidence Raising a Fact Issue Regarding the Existence of an Undertow or Boil Effect Do Not Relate to a Discretionary Design Decision**

TRWD contends that all of the Johnsons' claims, including those related to the scour hole and possible undertow and boil at the base of and immediately downstream of Dam No. 2, are barred by section 101.056. The Johnsons, however, respond that the discretionary acts exception does not apply to those aspects of the Premises because

> Here, TRWD knew of and allowed the large scour hole at the base of Trinity Park Dam No. 2, knew of and allowed the dangerous conditions created by the large scour hole, including an undertow and boil effect which made swimming difficult, and knew of and allowed the dangerous 10 to 12 foot depth of the scour hole. The scour hole made the depth of the Clear Fork 10 to 12 feet deep instead of three feet. TRWD knew of and allowed all of these dangerous conditions on the premises.
>
> As TRWD's Dam Safety Engineer has testified, the scour hole was not part of any TRWD design and did not rely on any TRWD design. The scour hole, boil effect, undertow and river depth did not rely on any TRWD design. The scour hole, boil effect, undertow and

21

river depth were a defective and dangerous condition at the base of Trinity Park Dam No. 2 that TRWD knew of but TRWD allowed to exist. The scour hole, boil effect, undertow and river depth were all dangerous conditions that did not rely on design decisions and are not subject to the discretionary acts exception.

[Citation omitted.] Therefore, we will likewise review the evidence related to the scour hole and condition of the river at the base of and immediately downstream of the dam.

According to Verreault, the original channelization of this part of the Trinity River by the Army Corps of Engineers was for the purpose of preventing and minimizing flooding. That effort included grade leveling of the channel; design grade is important to prevent erosion while also keeping water moving downstream. The intended grade for the area in which Dam No. 2 is now located was 522 feet mean sea level. After the channelization, the original dams were constructed for purposes of sediment and erosion control.

The evidence showed that prior to the 2003 reconstruction of Dam No. 2, a scour hole existed two to three hundred feet downstream of the original dam, which created a boil effect. According to Verreault, the formation of scour holes downstream of low-water dams was common before 2003 because the "near vertical-to-vertical" downstream face of such dams "highly aerated" the water flowing over them as it dropped down the dam faces. The force of the downward flowing water would "impact[] the water immediately on the downstream side of the structure," creating a "zone of rotation" as it flowed along the bottom of the river channel, rose downstream, and was "directed back toward the face of the

22

structure." This highly aerated area is called a boil, and it pushes objects that fall into the river in that area from the top to the bottom, directing them back toward the structure. This is a natural consequence of water flowing over such a vertical-face dam. These pre-2003 vertical-face dam designs caused drownings, including drownings of rescue crew members, and capsized boats.

Verreault averred in an affidavit that the 2002 design of Dam No. 2, on the other hand,

> creates a higher water pool downstream without a vertical drop even during higher water flow. The chute is designed to direct water along the surface of the river and not towards the bottom of the channel. Therefore, if an individual falls off the dam, there is no hydraulic boil that pushes them down, keeps them under water, and pulls them back toward the dam. Rather, the flow of water should push the individual downstream and toward the side of the river to shallow water.

According to Verreault, there is "no boil zone and no undertow created by" Dam No. 2, and anyone who falls off the dam should not encounter anything other than the normal flow of the river. He agreed that a boil makes swimming more difficult but reiterated that the design of Dam No. 2 "does not create a boil."

Verreault admitted that the flow of water through the kayak chute creates a "standing wave" on the other side. But according to Verreault, once water exits the chute, its velocity drops off because the channel widens; a "very thin stream of water mov[es] through the channel that almost appears to stop as the water spreads out, and there's no velocity on the sides of that." Verreault said that the

23

flow would not have drawn Brandy under the water because of the design of the dam.

Verreault averred that the base of the kayak chute is at approximately 525.5 feet mean sea level. He also averred that a bathymetric survey of the river channel that he performed in 2003 during the reconstruction of the dams showed that the mean sea level immediately downstream from the old dam varied from bank to bank from 514 feet mean sea level to 525 feet mean sea level. The center part of the channel that was closest to the downstream face of the old dam ranged from 514 to 518 feet mean sea level, which means that if the Corps had excavated that part of the channel to the original design grade—522 feet mean sea level—the channel bottom immediately below the downstream face of the old dam had eroded four to eight feet below the original design grade. This result is the natural, expected effect of the flow of water over the old-style vertical face dams.

When TRWD redesigned and reconstructed Dam No. 2 in 2002 and 2003, it decided not to fill in the existing scour hole to bring the channel elevation back to the originally designed 522 feet mean sea level. Because the base of the kayak chute would be at 525.5 feet mean sea level, TRWD was concerned that kayakers wanting to perform underwater rolls or other maneuvers after passing through the chute could hit their heads or kayaks on the river bottom with only a three and one-half foot clearance. Instead, TRWD decided that the existing

scour hole, which the plan designated as being approximately 516 feet mean sea level, would remain in place.

Beason averred that TRWD learned of the scour hole created by the old dam during the 2003 construction. The redesign contemplated that the "existing pool," which was described in the plan as 516 feet mean sea level "or approximately 8 or 9 feet of water depth below the chute," would remain in place after construction of Dam No. 2. During the construction, workers built a temporary "coffer dam," and "numerous items of rubble (such as soil, gravel, and remnant concrete) were dislodged by the construction equipment and slid into the scoured area." According to Beason, after construction of Dam No. 2 was complete, he consulted with the designer, who told Beason that the river bottom downstream of the kayak chute needed to be at a depth of at least eight feet. Therefore, TRWD removed the coffer dam and "graded the channel bottom to a depth that would keep the river channel bottom no less than 8 feet from the bottom of the kayak chute built into the dam."

However, evidence also shows that at the time of Brandy's death, the scour hole at the base of the kayak chute was deeper than even the eight feet contemplated at the conclusion of the dam rebuild. According to Verreault, sometime before or after Brandy's death—Verreault could not remember whether in 2012 or 2013—as a result of an unrelated hydrographic survey, TRWD discovered a scour hole located from the base of the dam to approximately two hundred feet downstream from Dam No. 2, stretching 150 feet

25

across. The loose materials that had been used for the fill had been washed away at some point, possibly during a flood event in 2007. Verreault did not think the scour hole resulted from the flow of water from the kayak chute. He acknowledged that a small island of debris appearing to be the fill that had been placed in the river bottom had appeared downstream, but he did not know when that "island" had appeared. Verreault agreed that if the design grade of the river bottom had been elevated to 522 feet mean sea level at the downstream base of Dam No. 2, a person would have been able to stand up.

Two witnesses in the Park Plaza building south of the river adjacent to Dam No. 2 saw a person in the water that day. One heard screaming and when he looked out his office window, saw hands flailing above the water from someone in the river who was "closer to the near shore" and who "appeared to be unable to swim and was floating with the drift of the current." The other witness looking out of the building saw a head above the water near where Brandy's body was found. The Fort Worth Fire Department Dive Team noted that the depth of the water where Brandy was found was thirteen feet.

After Brandy's death, Beason contacted the designer of the kayak chute, Gary Lacy, to ask if any changes could be made to the dam or surrounding area that might decrease the risk of drownings. Lacy advised Beason that raising the channel bottom depth to 522 feet mean sea level, approximately three and one-half feet below the kayak chute, was now feasible because many kayakers had moved to using "shorter, stubbier 'play' boats." This development in the sport of

26

kayaking made raising the channel bottom more feasible than it would have been in 2003.

Verreault testified by deposition that part of his job with TRWD is to monitor "any deposition of sediment on or near a dam that might need to be removed from the river, or any areas indicated by bathymetric surveys that need to be filled in, in order to make the river bottom match the design grade." He testified that TRWD's Board had approved changes to the design grade immediately downstream of Dam No. 2 in August 2015, which included bringing the grade immediately adjacent to the base of the kayak chute to within three feet of the base of the chute, or about 522 feet mean sea level. Verreault agreed with the decision to raise the grade at that location, as recommended by Lacy, because as "part of [TRWD's] program to both raise levees and channel bottoms or lower them to design grade," this was an area that needed to be changed. Additionally, he said that if the grade were elevated to that level, a person of sufficient height could stand up if he or she fell into the river at that location.

Beason testified that the primary maintenance for the dam is "debris removal after storms [and] flow events." He also had the job of replacing warning signs that may have been damaged during storms. Beason was aware of the scour hole or "plunge pool" at the base of the kayak chute; he thought it was at least eight feet deep as a result of the 2002 redesign. Before the rebuild, this "plunge pool" was eleven feet deep; thus, the concrete and rubble fill that was placed in it during the reconstruction brought it up only about three feet, still

27

about eight feet under the pre-dam design grade of 522 feet mean sea level. The 2015 design changes—bringing the grade up to around 522 feet mean sea level—occurred because after Brandy's death, TRWD was told by the police that the depth was eleven to thirteen feet. Beason thought that was unusual at the time because he remembered that it was supposed to be eight feet.

According to Beason, as a result of the Fire Department Dive Team's report about the depth of the river where they found Brandy, he ordered a bathymetric survey, which indicated the depth of the water at that location was, indeed, eleven to thirteen instead of eight feet deep. When asked why he thought so many people had drowned at Dam No. 2, Beason said,

> I wish I knew what the real problem was. . . . I have no employees that have had any eyewitness . . ., the witness statements are somewhat ambiguous and conflicting. Did someone fall off the dam into the water? Were they in the chute? Were they not in the chute? I have nothing to tell me that -- what exactly happened.

The evidence thus shows that the depth below the dam was supposed to be eight feet by design, but was instead eleven to thirteen feet deep; that the scour hole was partially made up of loose debris and fill that washed away and became deeper over time; that TRWD was charged with monitoring and maintaining the channel depth; that an almost eleven foot deep scour hole had existed before Dam No. 2 was rebuilt in 2003 and filled into a depth of eight feet; that a boil effect had existed at the previous dam on the same site; that an artificial island of debris had been created downstream of Dam No. 2; and that at least one person who had swum in that area to save a child indicated that the

28

water pushed her down to the bottom and then popped her back up. This is some evidence contradicting TRWD's assertion that Verreault's testimony conclusively proved that there was no boil effect due to the design of the kayak chute and thus creating a fact issue as to whether TRWD's failure to maintain the eight-foot-designed depth contributed to the creation of a boil effect or undertow at the base of Dam No. 2. Thus, the complaints about the deepening scour hole and possible related boil effect are not complaints about the original design, but rather the failure to maintain the original design. *See Trevino*, 153 S.W.3d at 62–63 (holding that section 101.056 did not reinstate immunity from allegations that bleachers had not been properly maintained in a safe condition when supported by police report stating that the sides of the bleachers were loose from wear and tear and that some of the platform boards were slightly warped, "possibly causing someone to trip").

Conversely, the Johnsons' complaints—that had the original scour hole existing in 2002 and 2003 (when the dam was redesigned and rebuilt) been filled in to a three-foot depth, Brandy would have been able to stand up when she fell in—are all related to a discretionary design function. No evidence shows that TRWD ever planned in 2002 or 2003 to raise the existing scour hole to a three-foot depth; instead, the evidence shows that the eight-foot depth design was intentional so as to accommodate the passage of kayakers and boats.

29

**No Evidence Supports the Allegation that Either a Misuse of
Personal Property or a Special Defect Caused Brandy's Death**

TRWD argues that the Johnsons cannot maintain any surviving claims under either a misuse of personal property theory or a special defect theory because as a matter of law, they have not alleged or shown a viable claim under either theory. The Johnsons do not argue that they can maintain such claims, and we agree. The Johnsons did not allege any specific personal property misused by TRWD, nor did any of the evidence show such a misuse. To the extent that they alleged a misuse of the warning signs because they are inadequate, TRWD's liability is not waived; a nonuse or failure to erect adequate signage is not an allegation of misuse of personal property. *See City of Fort Worth v. Crockett*, 142 S.W.3d 550, 554 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g). Additionally, the conditions of which the Johnsons complain cannot be special defects. A special defect is a condition of the same kind or class as an excavation or obstruction. *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 847 (Tex. 2009) (op. on reh'g). Additionally, "a special defect must be something out of the ordinary course of events rather than a long-standard, routine, or permanent defect." *Tex. Dep't of Transp. v. Andrews*, 155 S.W.3d 351, 356–57 (Tex. App.—Fort Worth 2004, pet. denied) (quoting *Villarreal v. State*, 810 S.W.2d 419, 422 (Tex. App.—Dallas 1991, writ denied)). There is no evidence that an ordinary user of Dam No. 2 would encounter the scour hole and boil effect. Although the Johnsons presented evidence that people would walk

30

"all over" the dam and that some had fallen off of the dam, there is no evidence that the deepened scour hole or resulting boil effect was a temporary condition out of the ordinary course of events that would have created an unexpected danger to an ordinary user of the dam. Accordingly, we conclude and hold that they did not allege a special defect. *See Beynon*, 283 S.W.3d at 330–32; *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 238–39 (Tex. 1992) (op. on reh'g); *Wardlaw v. Tex. Dep't of Transp.*, 307 S.W.3d 369, 373–74 (Tex. App.—San Antonio 2009, no pet.). We thus must address TRWD's final argument regarding whether the Johnsons alleged a premises defect claim for which immunity is waived under section 101.021.

### TRWD Did Not Allege that the Deeper "Scour Hole" and Alleged Boil Effect Was Open and Obvious

TRWD finally argues that even if part of the Johnsons' claims are not barred, they nevertheless failed to state a claim for which its liability is waived because the danger to Brandy was open and obvious.[6] But because TRWD did not assert in its plea to the jurisdiction that the scour hole and boil effect were open and obvious—only the kayak chute and water running through it—the trial court did not err by denying its plea to the jurisdiction on that basis.

Accordingly, we overrule TRWD's issue as to the Johnsons' allegations regarding the deepening scour hole and resulting boil effect due to TRWD's

---

[6]TRWD raised other ways in which it contends the Johnsons failed to state a claim that was waived under sections 101.021 and 101.022 in its plea to the jurisdiction, but it limits its argument on appeal to its open and obvious argument.

31

alleged failure to maintain that area and part of the river channel around Dam No. 2. But we sustain its issue as to the Johnsons' complaints about the remainder of the Premises, including that TRWD should have filled in the scour hole during the 2002 redesign and 2003 rebuild of Dam No. 2 to a depth of only three feet below the kayak chute.

## Conclusion

Having overruled TRWD's sole issue in part, we affirm the trial court's order denying TRWD's plea to the jurisdiction in part as set forth in this opinion. But having sustained its issue in part as to some of the Johnsons' claims as detailed above, we reverse the trial court's order as to those claims and render a judgment of dismissal of those claims only. *See* Tex. R. App. P. 43.2(c).

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

SUDDERTH, J., filed a concurring and dissenting opinion.

DAUPHINOT, J., concurs without opinion.

DELIVERED: December 30, 2016