# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00617-CV

---

**Reagan National Advertising of Austin, Inc., Appellant**

**v.**

**Carolyn Pfeiffer, Appellee**

---

**FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 20-0527-C368, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Reagan National Advertising of Austin, Inc. appeals the district court's final order granting Carolyn Pfeiffer's plea to the jurisdiction. Pfeiffer's plea alleged that when Reagan filed the underlying declaratory-judgment action there was no justiciable controversy between the parties concerning Reagan's right of first refusal (ROFR) in two billboard leases and under an unsuccessful purchase-and-sale agreement. Reagan contends that the district court erred by: (1) considering evidence in determining Pfeiffer's plea; (2) ruling for Pfeiffer on the merits of the plea when the evidence showed that Reagan properly exercised its ROFR; and (3) ruling on the merits of the plea before discovery. We will affirm the district court's order.

### BACKGROUND

Pfeiffer owns 51.06 acres of land in Williamson County (the Property). Pfeiffer and Reagan signed a ten-year lease May 1, 2000 for placing outdoor advertising signs on a 100

by 100 square-foot area of the Property (the "2000 Lease"). The 2000 Lease automatically renewed in 2010 for another ten-year term. Meanwhile, Pfeiffer and Reagan signed a ten-year lease on July 1, 2004, for placing outdoor advertising signs on a separate 100 by 100 square-foot area of the Property ("the 2004 Lease"). The 2004 Lease automatically renewed in 2014 for another ten-year term.

The leased "Premises" are identified in the 2000 Lease and the 2004 Lease (collectively, the Reagan Leases) as located on the east side of FM 685, north of Kaatz Lane and "more particularly described" in "Exhibit A." This is Exhibit A attached to the 2000 Lease:

**EXHIBIT "A"**
**TO LEASE AGREEMENT**

Legal Description: ___51.06 acres in the N.D. Walling___
___Survey, AB 675.___

(Sign to be located within 100 feet of the North West corner of the property.)

* First right of refusal only Applies to 100' x 100' AreA ON North property LiNe, KNowN As AReA "A"

North Prop. Line

100'

100'

AreA "A"

N ↑

51.06 AC.

FM 685

KAAtz LN.

2

This is Exhibit A attached to the 2004 Lease:

EXHIBIT "A"
TO LEASE AGREEMENT

Legal Description:     51.06 acres in the N.D. Walling
                       Survey, AB 675

PLAT TO ACCOMPANY
PARCEL DESCRIPTION

Proposed Premises
(100' x 100'
bordered by Katz
Lane on South side
and Hwy 130
proposed drainage
easement on west
side)

**Reagan's Right of First Refusal in its 2000 and 2004 Leases with Pfeiffer**

Both Reagan Leases contain a ROFR for Reagan. Fairly summarized, the ROFR provides that: (1) Pfeiffer will notify Reagan if she accepts a third-party's offer during the lease term to buy the Premises and provide Reagan with a copy of that offer; (2) Reagan will have 30 days to give notice of its intent to acquire the Premises on the same terms and conditions in the third party's offer; and (3) closing dates listed in the third-party's offer are extended for the thirty-day period that Reagan has to provide notice of its intended acquisition of the Premises. The ROFR in the 2000 Lease states, in relevant part:

> [Pfeiffer] shall give written notice to [Reagan] of the terms and price of any offer by a third party during the term of this lease to purchase the Premises described herein, which offer [Pfeiffer] has accepted ("Offer"). [Pfeiffer]'s written notice shall include a full complete copy of the Offer. [Reagan] shall be entitled for thirty (30) days after its receipt of the Offer to give written notice of its intent to acquire the Premises on the same terms and conditions in said Offer (although all closing dates in said Offer shall be extended by the thirty (30) day period within which [Reagan] is entitled to provide its written notice of its intent to acquire the Premises).

The ROFR in each of the Reagan Leases is identical except for the provision addressing Reagan's notice of intent to acquire the Premises. That provision of the ROFR in the 2004 Lease expressly refers to the Premises "outlined on Exhibit 'A'":

> [Reagan] shall be entitled for thirty (30) days after its receipt of the Offer to give written notice of its intent to acquire the Premises **outlined on Exhibit "A"** on the same terms and conditions in said Offer (although all closing dates in said Offer shall be extended by the thirty (30) day period within which [Reagan] is entitled to provide its written notice of its intent to acquire the Premises).

(Emphasis added.)

4

Both Reagan Leases state that the ROFR applies to the two 100-foot squares of Pfeiffer's land that Reagan leased. The 2000 Lease has Pfeiffer's handwritten note next to the ROFR paragraph: "see area 'A' in Ex[h]ibit 'A.'" The exhibit attached to the 2000 Lease, shown in the first image above, has Pfeiffer's handwritten note specifying: "First right of refusal only applies to 100' x 100' area on North property line [k]nown as Area 'A'." Similarly, the 2004 Lease describes the Premises as "a 100 square foot area in Exhibit 'A,'" as shown in the second image above.

**Pfeiffer's Purchase and Sale Agreement with P4**

Pfeiffer received an offer from P4 Development, LLC, for 27.97 acres of her land (the Entire Tract).[1] Her counsel notified Reagan that a contract was in progress and that when finalized, a copy of the receipted contract would be sent "so Reagan can review it in regards to its right of first refusal on the two portions of the property covered by the billboards."

Thereafter, Pfeiffer signed a $3 million Purchase and Sale Agreement (PSA) with P4 for the Entire Tract. The PSA stated that the purchase price for the Entire Tract was the sum of $338,237.37 for each Billboard Tract plus $2,323,525.26 for the Remainder Tract. Notably, the PSA acknowledged Reagan's ROFR on the Billboard Tracts and allowed for reduction of P4's purchase price for the Entire Tract if Reagan exercised the ROFR as to the Billboard Tracts:

> ROFR. [Pfeiffer] has notified [P4] that [Reagan] under the Leases (as defined below) has a right of first refusal on any offer to buy [the Billboard Tracts]. [Pfeiffer] shall provide written notice of [P4]'s offer to purchase [the Billboard Tracts], for the Purchase Price allocable thereto and on such other material terms

---

[1] We refer to the three tracts of Pfeiffer's property as her brief does: (1) the two 100' x 100' areas leased to Reagan are the "Billboard Tracts"; (2) the 27.97 acres, inclusive of the Billboard tracts, is the "Entire Tract"; and (3) the Entire Tract minus the Billboard Tracts is the "Remainder Tract." The record refers to these as Tracts 1, 2, and 3, respectively.

as are set forth in this Agreement (the 'ROFR Terms'), to [Reagan] within five (5) business days after the date [Pfeiffer] provides copies of the Leases to [P4]. Such notice shall include the minimal period of time allowable, or if no such time is specified the minimal period of time that is reasonable for offers of this nature, during which [Reagan] may exercise its right of first refusal.

. . . .

In the event that [Reagan] elects to exercise its right of first refusal and purchase one or both of Tracts 1 and 2 on the ROFR Terms (the 'Lessee Property'), the amount of Purchase Price to be paid by [P4] under this Agreement shall be automatically reduced by the amount of Purchase Price allocable to the Lessee Property as set forth in Section I above. Notwithstanding anything to the contrary contained in this Agreement, to the extent that [Reagan] exercises its right of first refusal and purchases the Lessee Property, all references to the Property in this Agreement shall be deemed to exclude the Lessee Property.

The effective date of the PSA between Pfeiffer and P4 was March 25, 2019. For 180 days afterward—until September 21, 2019—P4 had the right to inspect the Property and to terminate the PSA. After that 180-day inspection period specified in the PSA, P4 was deemed to have accepted the Property and had thirty days—until October 21, 2019—to close. Then, under the ROFR in the Reagan Leases, Reagan had an additional thirty days to close after the closing date stated in the offer from the third party, P4. Thus, Reagan's deadline to close would have been November 20, 2019. The PSA states that "[w]ith respect to all provisions of this Agreement, time is of the essence."

**Pfeiffer's Notice to Reagan of PSA and Reagan's Response that ROFR Covers Entire Tract**

Correspondence between the parties documents the dispute that arose about the scope of the ROFR. Because this correspondence provides useful context for the parties'

appellate arguments, we summarize their initial, follow-up, and final discussions on the ROFR

that culminated in Reagan's declaratory-judgment suit against Pfeiffer.[2]

### 1. Initial discussions about ROFR

On March 26, 2019, Pfeiffer's counsel sent a copy of the PSA to Reagan:

> We have a contract now with the buyer [P4]. Accordingly, we forwarded the leases [to P4] as per your approval below. Additionally, attached is the receipted contract for the two billboard sites (along with a third tract for the remaining acreage, which is not subject to the right of first refusal in the leases), which is the offer to purchase as detailed in the leases. Please note the billboard tracts' purchase prices are for tracts 1 and 2, more detailed in Section 1. Thank you for your help to date and we would greatly appreciate a response as soon as possible either way so we can let the buyer know.

In an April 22, 2019 response, Reagan's counsel stated that Reagan exercised "its right of first

refusal as to all of the property covered by the above-referenced Purchase and Sale Agreement,"

not just the Billboard Tracts specified in the Reagan Leases:

> As you may know, by the terms of the Lease and applicable law, Reagan has the right and, if exercised, the obligation to comply with, and to the benefit of all terms and conditions set forth in the Purchase and Sale Agreement to which it has a right of first refusal. Pursuant to that right and obligation, Reagan hereby exercises its right of first refusal as to all of the property covered by the above-referenced Purchase and Sale Agreement. Reagan is prepared to execute a purchase and sale agreement under the same applicable terms and conditions as exists in the Purchase and Sale Agreement and to tender the earnest money in accordance therewith.
>
> Please note that nothing in this letter shall be construed as a waiver, relinquishment and/or modification of any right or remedy available to Reagan pursuant to the Leases, the Purchase and Sale Agreement, and/or applicable law. Reagan expressly reserves all such rights and remedies.

---

[2] Reagan's response to Pfeiffer's plea to the jurisdiction adopted her attached evidence: "Attached to [Pfeiffer]'s Jurisdictional Plea are the documents and communications between the parties which are adopted as true and correct."

Pfeiffer's counsel replied that the ROFR did not extend to any land beyond the two squares of Pfeiffer's land that Reagan had leased: "Just to be clear, the ROFR only applies to Tracts 1 and 2 [the Billboard Tracts] as each is described under the PSA. Tract 3 [the Remainder Tract] is not applicable to the ROFR. Please confirm that is your client's understanding as well." Reagan's counsel disputed that the ROFR did not extend to all 27.97 acres: "[I]t is our position we get the benefit of, and have the obligation to comply with, all the terms and conditions in the contract. This gives us the right and obligation to buy all the properties." He further stated:

> You might be right if a contract included only the lease property, or only included property not covered by the lease, but this contract included both. Your buyer did not get to choose, it had to buy them all. So we have that right and obligation too under the law.

## 2. Follow-up discussions on ROFR

A week later, on May 2, 2019, Reagan's counsel asked Pfeiffer's counsel to confirm whether Pfeiffer would "honor[] Reagan's right of first refusal as exercised so we can move forward with getting the contract in place that matches the terms and conditions of the existing contract." Pfeiffer's counsel replied:

> My understanding was that you were going to provide me with the case law you referenced on the phone substantiating Reagan's position that it had a right to purchase the entire property versus just the two leased premises detailed in the leases. Could you please forward that case law at your earliest convenience so I can review and provide a response? Until I receive that, I am not in a position to state definitively that Reagan has the right to purchase Tract 3 of the contract. However, as to Tracts 1 and 2 (the billboard tower sites), the seller will honor what is set out expressly in the leases.

Relying generally on *Texas State Optical v. Wiggins*, Reagan's counsel contended that Reagan could elect whether to buy only the Billboard Tracts or the Entire Tract. *See*

882 S.W.2d 8 (Tex. App.—Houston [1st Dist.] 1994, no writ). His stated understanding was that *Wiggins* requires an ROFR holder "to accept all terms of the deal other than those offered in bad faith or to circumvent the right of first refusal" and that P4 "has to buy all the property unless we elect only to buy those two tracts[, but Reagan had] elected to buy it all, not just the two tracts." He requested to "move forward under Re[a]gan's election" and stated that "Reagan is prepared to sign a contract and/or tender earnest money."

Pfeiffer's counsel responded that Reagan's ROFR relates only to the Billboard Tracts, based on the unambiguous Reagan Leases, and that Reagan was not compelled to buy the Remainder Tract:

> The leases between the parties are unambiguous that the ROFR is only related to Tracts 1 and 2. The contract expressly discusses your client's ROFR and that your client's only obligations are to acquire Tracts 1 and 2. The seller is not trying to force your client to buy Tract 3 (and neither is the buyer from my understanding). I still can't understand how you interpret this contract to enable your client to expand its ROFR past the express terms in the leases. Please advise.

### 3. Final discussions on ROFR and declaratory-judgment suit filed

The next correspondence in the record is two months later, on July 9, 2019. Pfeiffer's counsel reasserted that Reagan's ROFR covered only the Billboard Tracts, and that Reagan's rights under the Reagan Leases could not be unilaterally expanded to sweep all 27.97 acres into the ROFR. Pfeiffer's counsel cited legal authority for his position and reiterated that Pfeiffer remained "ready, willing, and able to deliver executed purchase contracts for Tract 1 and Tract 2 on the same terms that she was willing to give to P4." To that end, Pfeiffer's counsel stated that he was attaching a new "purchase and sale contract" reflecting Reagan as the buyer of the Billboard Tracts, with the same terms and conditions as the PSA. Additionally, Pfeiffer's

counsel stated that Pfeiffer intended to sell the Remainder Tract to P4, unless a court order directed otherwise. Finally, Pfeiffer's counsel noted that although Reagan was "attempting to renegotiate the Leases with P4 by reducing the rent substantially and extending the term of the Leases by several additional decades in exchange for Reagan withdrawing its exercise of its ROFR," Pfeiffer remained the owner of the Property until closing and the only one with whom such negotiations would be proper.

Reagan's counsel responded the following week, expressing Reagan's belief that it "ha[d] the right to purchase the entire tract" and raising new arguments about illegal subdivision and questionable allocation of the purchase price: (1) "If the prospective buyer has the right to buy the entire tract, Reagan has the right to match such terms under its right of first refusal"; (2) "Forcing Reagan to purchase only the two corner tracts would cause an illegal subdivision of the property"; and (3) "Reagan questions the allocation of the purchase price among the proposed tracts."

Six months later, on January 23, 2020, Pfeiffer's counsel notified Reagan's counsel that Reagan was in default because it failed to close under the PSA by the November 20, 2019 closing date and failed to deposit its $10,000 earnest money into escrow for approximately ten months after Reagan stated that it was exercising the ROFR.[3] Pursuant to the PSA, Pfeiffer gave Reagan ten days to cure the default. Although Pfeiffer stated her disagreement with Reagan's understanding of the ROFR in the Reagan Leases, she expressed her willingness to sell the Entire Tract to Reagan if it timely cured the default and closed on all three tracts by paying the $3,000,000 price in the PSA for them. That did not occur.

---

[3] During the hearing on the plea to the jurisdiction, Reagan acknowledged its "failure to tender earnest money" but argued that its failure did not "go to the jurisdictional question."

10

On March 31, 2020, Reagan sought declaratory judgment "to preserve its rights." Reagan's pleadings requested that the district court declare Reagan's rights under its ROFR, determine any other disputes regarding the terms of the sale, order that Reagan "may exercise its purchase option at the price to be determined by the finder of fact," and compel specific performance.

Pfeiffer answered and several months later filed her plea to the jurisdiction. In her plea, she contended that the district court lacked jurisdiction because when Reagan filed suit, there was no justiciable controversy between the parties. At that time, the PSA had terminated as to P4, Reagan had failed to perform under the PSA as to the ROFR, and the PSA had terminated as to Reagan, thereby returning the parties to their pre-PSA status. Pfeiffer further contended that without an "active offer for sale or acceptance on either of the Premises," the district court could only speculate as to Reagan's rights under a nonexistent sales contract and render a prohibited advisory opinion.

The district court convened a hearing, considered the evidence presented, and subsequently signed an order granting the plea. This appeal followed.

**DISCUSSION**

Reagan contends that the district court erred by: (1) considering evidence in determining the plea because the facts challenged by the plea were not jurisdictional; (2) ruling for Pfeiffer on the merits of the plea when the evidence showed that Reagan properly exercised its ROFR; and (3) ruling on the merits of the plea before discovery. Pfeiffer responds that the district court's order was not a determination on the merits regarding the correct interpretation of

11

the ROFR but was instead a ruling that when Reagan filed suit on March 31, 2020, there was no live controversy necessary for declaratory relief. For the following reasons, we agree.

**Standard of Review and UDJA's "Actual Controversy" Requirement**

"A plea to the jurisdiction challenges the court's authority to decide a case." *Sneed v. Webre*, 465 S.W.3d 169, 180 (Tex. 2015) (quoting *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012)). "A plea to the jurisdiction 'may challenge the pleadings, the existence of jurisdictional facts, or both.'" *Texas Dep't of Crim. Justice v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020) (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)). "[W]hen a plea to the jurisdiction challenges the existence of jurisdictional facts, we look beyond the pleadings and consider evidence submitted by the parties 'when necessary to resolve the jurisdictional issues raised,' even if the evidence implicates both the court's jurisdiction and the merits of a claim." *Id.* (quoting *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004)).

Additionally, "[w]hen a plea to the jurisdiction challenges the existence of jurisdictional facts with supporting evidence, the standard of review mirrors that of a traditional summary judgment: all the evidence is reviewed in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 664 (Tex. 2019) (quoting *Miranda*, 133 S.W.3d at 227-28). "However, if the relevant evidence is

12

undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* (quoting *Miranda*, 133 S.W.3d at 228).

"Through a plea to the jurisdiction, a movant may raise any ground on which the movant claims the court has no subject-matter jurisdiction." *City of Austin v. L.S. Ranch*, 970 S.W.2d 750, 752 (Tex. App.—Austin 1998, no pet.). Existence of a justiciable controversy is a necessary aspect of a court's subject matter jurisdiction. *See State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). We review a trial court's ruling on a plea to the jurisdiction de novo. *Johnson*, 572 S.W.3d at 664.

A plaintiff bringing a suit under the Uniform Declaratory Judgments Act (UDJA) must still properly invoke the trial court's subject matter jurisdiction. *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683-84 (Tex. 2020); *see generally* Tex. Civ. Prac. & Rem. Code §§ 37.001-.011. This is because the UDJA is "a procedural device for deciding cases already within a court's jurisdiction" and does not permit courts to render advisory opinions. *Lynch*, 595 S.W.3d at 683-84 (quoting *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)). The UDJA provides in relevant part, "A person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code § 37.004(a). "The UDJA does not authorize a court to decide a case in which the issues are hypothetical or contingent—the dispute must still involve an actual controversy." *Lynch*, 595 S.W.3d at 684; *see California Prods., Inc. v. Puretex Lemon Juice, Inc.*, 334 S.W.2d 780, 781 (Tex. 1960) (noting that UDJA "does not license litigants to fish in judicial ponds for legal advice").

13

**District Court Did Not Err by Considering Evidence in Determining Plea to Jurisdiction**

Reagan contends that the district court should have determined whether it had subject-matter jurisdiction by considering only the pleadings and that it erred by considering evidence because the facts challenged by Pfeiffer's plea were not jurisdictional. We disagree.

Pfeiffer's plea addressed facts necessary to the jurisdictional question of justiciability that could not be determined from Reagan's pleadings alone. Pfeiffer contends that Reagan waited to file its declaratory-judgment suit until nearly four months after November 20, 2019, the last possible date under the PSA to close the transaction. Reagan's pleadings requested declaratory relief and alleged that there was a controversy between the parties concerning the scope of the ROFR and the legality of the subdivision of the tracts in the PSA, but those pleadings lacked any reference to the ROFR timeframes.

Pfeiffer's plea presented a jurisdictional question concerning the existence of the "actual controversy" necessary for Reagan's requested declaratory relief. *See Lynch*, 595 S.W.3d at 684; *A.P. Simons Co. v. Julian*, 531 S.W.2d 451, 454 (Tex. Civ. App.—Eastland 1975, no writ) (dismissing appeal for want of jurisdiction in absence of justiciable controversy as to right of first refusal and noting that "[t]here must be a justiciable controversy between the parties before a declaratory judgment action will lie"); *see also Spring Branch Wildlife Pres. v. Dow Chem. Co.*, No. 14-17-00539-CV, 2018 Tex. App. LEXIS 8190, at *10 (Tex. App.—Houston [14th Dist.] Oct. 9, 2018, no pet.) (mem. op.) (dismissing appeal of declaratory-judgment action for lack of jurisdiction in absence of justiciable controversy between parties after termination of lease). "A right of first refusal has been described as 'essentially a dormant option.'" *Carl M. Archer Tr. No. Three v. Tregellas*, 566 S.W.3d 281, 291 (Tex. 2018). To determine whether an actual controversy existed, the district court had to decide whether

14

Reagan's ROFR was dormant or active on March 31, 2020, when it filed its declaratory-judgment suit. Thus, the relevant timeframes are the dates found in the Reagan Leases and the PSA, and the date that Reagan filed its suit.

However, Reagan did not append the Reagan Leases or the PSA to its pleadings and those pleadings did not discuss the relevant timeframes, such as the period for exercising the ROFR, the inspection period in the PSA, and the closing date in the PSA. Thus, the district court could not evaluate from the pleadings alone whether Reagan had filed suit within the time for exercising the ROFR in the Reagan Leases and before the applicable deadlines in the PSA expired. Pfeiffer provided the Reagan Leases and the PSA as evidence in support of the justiciability issue raised in her plea. As mentioned, "when a plea to the jurisdiction challenges the existence of jurisdictional facts, we look beyond the pleadings and consider evidence submitted by the parties 'when necessary to resolve the jurisdictional issues raised,' even if the evidence implicates both the court's jurisdiction and the merits of a claim." *Rangel*, 595 S.W.3d at 205 (quoting *Miranda*, 133 S.W.3d at 227); *see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) (noting that "the trial court should have considered [movant's] evidence in deciding its plea to the jurisdiction, and apparently did so").

On this record, we conclude that the district court did not err by considering evidence in determining the plea to the jurisdiction. Reagan's first issue is overruled.

**District Court Did Not Rule on Merits and Did Not Err in its Ruling**

Alternatively, Reagan contends that even if the district court properly considered Pfeiffer's evidence, its ruling on the merits of the plea would have nevertheless been erroneous

because Reagan properly exercised its ROFR as to all of Pfeiffer's property in her PSA with P4. We disagree.

The record shows that Pfeiffer did not request a ruling "on the merits." Her plea to the jurisdiction and her arguments during the hearing on the plea clarified that she sought a ruling only on the question of justiciability: whether Reagan filed suit while its ROFR was an active right. Although the plea stated Pfeiffer's position that Reagan "only has the right to purchase the property that it is currently leasing," the plea expressly stated that "that question is not properly present before the Court for determination."

During the hearing, Pfeiffer distinguished the jurisdictional nature of the dispute from the merits of the dispute, and the district court indicated that it understood the distinction:

> [Pfeiffer's counsel]: I think the dispute as to the merits—not what we're here about today, the jurisdictional question, but the merits question is: What is—does the ROFR cover, Tracts 1, 2 and 3, or does it cover merely Tracts 1 and 2, which is the property that—
>
> The Court: Right.
>
> [Pfeiffer's counsel]: —that Reagan had leased.
>
> The Court: Okay. Okay.
>
> [Pfeiffer's Counsel]: That's the merits question, which is different from the jurisdictional question that we're here about today.
>
> The Court: I gotcha. Okay.

Pfeiffer reiterated that she was presenting a jurisdictional issue exclusive of the merits question:

> Because when I read [Reagan's] response to our plea to the jurisdiction, one of the things that they addressed was that our plea to the jurisdiction seemed to go to the merits of this case, which is the scope of the ROFR. That's not what we're talking about here today. It's a jurisdictional question. And we're not asking you

16

to decide the scope of the ROFR today. That—again, that seems to be an issue raised by [Reagan] in [its] response, and we're not asking the Court to decide that. The scope of their ROFR, whether it can be enlarged to include the remaining acreage or not, is not a part of this plea.

. . . .

So the question here for Your Honor today is pretty simple: As of the date of filing, was there or was there not an active offer or contract on this ROFR property? If the answer to that question is, "Yes, we have a live offer," then there is jurisdiction and this case can go forward. If the answer to that question is, "No, there's no offer or live contract," then the ROFR is dormant, there is no justiciable controversy, and there is no corresponding jurisdiction and the case must be dismissed.

 . . .

What you've heard is that they want to make an argument about the merits in order to defeat the jurisdictional issue. I'm talking exclusively about the jurisdictional issue. We win on the merits, too; but as to the jurisdictional issue, they have not presented any cogent argument as to why their dec[laratory-judgment] action has—was filed within an active offer or contract period. They just haven't. And the facts indicate that they didn't.

In support of her plea to the jurisdiction, Pfeiffer points to decisions such as *Julian*, which concluded that dismissal of a cause for want of jurisdiction was warranted when there was no justiciable controversy between the parties as to a ROFR. *See* 531 S.W.2d at 454. The appellant in *Julian* unsuccessfully sought a declaratory judgment "to protect his interests" in his ROFR to purchase 100 acres of land upon an "offer by any third party." *See id.* at 452. However, because there was no such third-party offer or sale, there was no accrued right of purchase and no justiciable controversy for the court's determination. *See id.* at 453-54.

Similarly, Pfeiffer notes that when Reagan filed its declaratory-judgment suit "to preserve its rights" as to the ROFR, there was no third-party offer or live contract for sale. The district court could make that determination by referencing the timeframes in the documents and communications between the parties—evidence that Reagan expressly "adopted as true and

17

correct." Based on that evidence, including that Reagan failed to close by November 20, 2019, and failed to tender any earnest money under the PSA, the district court could have determined that Reagan filed its declaratory-judgment suit when the ROFR under the Reagan Leases was a dormant, inactive right.

Some of Reagan's contentions on the merits overlap with Pfeiffer's contentions about when declaratory relief should have been filed, which we address briefly. Reagan's challenge to the merits of the district court's ruling on the plea relies primarily on *FWT, Inc. v. Haskin Wallace Mason Property Management, LLP*, 301 S.W.3d 787 (Tex. App.—Fort Worth 2009, pet. denied). That opinion is not instructive. In *FWT*, the court considered whether a ROFR holder who exercises that right could be *compelled by the seller* to purchase assets, in addition to the land subject to the ROFR, as part of a bundled sale.[4] *See id.* at 789. Here, by contrast, the parties' communications plainly stated that Pfeiffer was not compelling Reagan to purchase the Entire Tract: "The seller is not trying to force your client to buy Tract 3 (and neither is the buyer from my understanding)." *FWT* says nothing about whether a landowner may be compelled to sell land, not subject to any ROFR, to the ROFR holder based on its demand to expand the ROFR when a third party offers to purchase such land. Reagan does not cite any authority for that proposition. *See In re HBT JV, LLC*, 571 B.R. 729, 751-52 (Bankr. N.D. Tex. 2017) ("No Texas case has allowed a preferential rightholder to compel the sale of property not subject to the right.").

---

[4] The third-party purchaser in *FWT*, unlike here, did not offer to purchase the assets independent of the lease or purchase of the property that was subject to the ROFR. *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., LLP*, 301 S.W.3d 787, 790 (Tex. App.—Fort Worth 2009, pet. denied). Under the PSA, P4 expressly offered to purchase Pfeiffer's land independent of the Billboard Tracts that were subject to Reagan's ROFR.

Reagan contends that it "engaged in the identical procedure encouraged and approved by the court in *Wiggins*" for preserving a ROFR. It did not. In *Wiggins*, the ROFR holder responded to the offer within the allotted timeframe, objected to some terms of the conveyance, clarified that it was exercising its ROFR subject to specific objections to the disputed terms, and filed its declaratory-judgment action regarding the disputed terms—all by the date specified for exercising the ROFR and before the closing date. *See* 882 S.W.2d at 10.

Unlike the ROFR holder in *Wiggins*, Reagan did not state that it would close subject to its objection. Rather, Reagan insisted on closing only if Pfeiffer acquiesced to its demand to buy the Entire Tract. On this point, Reagan argued, "Your Honor, this controversy has existed ever since [Pfeiffer] refused to perform and come to the closing table and *agree with us as to what our rights were* in terms of what it was we are able to purchase." Further, unlike the ROFR holder in *Wiggins*, Reagan did not file its declaratory-judgment suit until March 31, 2020, well after the ROFR deadline that ran thirty days from Reagan's receipt of the offer communicated by email on March 26, 2019, and the November 20, 2019 closing date. Nor did Reagan demonstrate its readiness to proceed to closing, despite the parties' dispute about the scope of the ROFR, by tendering the earnest money. *See McMillan v. Dooley*, 144 S.W.3d 159, 180 (Tex. App.—Eastland 2004, no pet.) (noting that ROFR holder who was not interested in package conveyance but was interested in purchasing only property covered by his ROFR provision "did not file the underlying action to obtain the trial court's assistance in enforcing the preferential purchase provision until more than two years after being presented with the offer"); *see also id.* at 181 (citing *Riley v. Campeau Homes (Tex.), Inc.*, 808 S.W.2d 184, 186 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.), and noting that ROFR holders in that case "deposited $5,000 earnest money as a tender of their intended performance").

19

In a footnote, Reagan contends that expiration of the ROFR presented a fact issue improper for a plea to the jurisdiction. However, determining the timeframe for Reagan to invoke the ROFR after receipt of the PSA and the timeframe for Reagan to close the transaction are readily ascertainable by reference to the PSA and the Reagan Leases, and those stated periods are not disputed. *See generally Pitman v. Sanditen*, 626 S.W.2d 496, 497-98 (Tex. 1981) (concluding that failure to close after option was exercised terminated lessor-lessee relationship). In sum, the evidence relevant to the jurisdictional issue, including the undisputed deadlines determinable from the Reagan Leases and the PSA, shows that Reagan delayed its declaratory-judgment suit until its rights under the PSA and ROFR expired and became dormant, such that no justiciable controversy existed between the parties as a matter of law. When there is no justiciable controversy, dismissal for want of jurisdiction is proper. *See Julian*, 531 S.W.2d at 454; *see also Spring Branch Wildlife Pres.*, 2018 Tex. App. LEXIS 8190, at *10.

Accordingly, we overrule Reagan's second issue. Moreover, because we have determined that the ruling requested and rendered on the plea was not a ruling on the merits of the scope of the ROFR, we need not reach Reagan's third issue, which is premised on the contention that the district court's issuance of a ruling "on the merits" and before discovery occurred was an abuse of its discretion. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the district court's order granting Pfeiffer's plea to the jurisdiction.

_____

Darlene Byrne, Chief Justice

20

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   August 3, 2022