# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00333-CV

---

**Texas State University, Appellant**

**v.**

**Sylvia Guillen, Appellee**

---

**FROM THE 453RD DISTRICT COURT OF HAYS COUNTY**
**NO. 19-3000, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Sylvia Guillen sued Texas State University (TXST) for personal injuries she sustained while descending an exterior campus stairway. TXST filed a plea to the jurisdiction and motion for summary judgment, asserting that it was entitled to governmental immunity and that Guillen failed to raise an issue of material fact on her premises-liability claim. In a combined order, the trial court denied TXST's plea and motion, and TXST appeals. For the following reasons, we affirm the trial court's order.

### BACKGROUND

In her live petition, Guillen alleges that on May 10, 2018, she visited TXST to help her granddaughter move out of her dorm, Lantana Hall. Guillen parked her vehicle and walked up a set of exterior concrete stairs to reach Lantana Hall and then used a different set of

exterior concrete stairs to walk down to her car.  Below is a photograph of the stairway that Guillen descended.[1]



Guillen alleges that as she descended the stairs, she

had her gaze down on the steps.  When she reached the last step [Step 14] she was able to see only the top of the step.  The varying

---

[1] Guillen took this photograph "about a month or so" after her fall.

height of the riser of the subject stair step would not have been visible to Guillen as she walked down the stairs . . . [and] was visible only if one looked at it from the bottom up, which she did not.

Guillen alleges that she "never saw that [Step 14] was bigger than the other steps before she stepped off it" and that because of the "significant and substantial riser height of the last step, when [she] stepped off [Step 14], she lost her balance and fell" and that the "lack of uniformity of the riser height of the stair created a dangerous condition and tripping hazard." She alleges that TXST owed her "a duty to maintain its premises in a reasonabl[y] safe condition and to warn of the existence of a defect on its premises" but that TXST breached that duty, proximately causing her injuries.

Guillen further alleges that TXST, its Director of Housing Facilities (Kyle Estes), and other employees "had actual knowledge of [Step 14]'s riser height," and that Estes had admitted he saw the difference in riser height before the date of Guillen's injury and had observed that the riser-height differential was "several inches." She alleges that the staircase violated the International Building Code, which requires stair risers to be of uniform size and shape and provides that the difference between the largest and smallest riser height shall not exceed three-eighths of an inch and that the maximum riser height for any stair is seven inches. Guillen alleges that she suffered a right ankle fracture, which required emergency surgery, and that she now has permanent implants and hardware in her body as a result.

In its plea to the jurisdiction and motion for summary judgment, TXST argued that Guillen had failed to allege or prove through evidence a premises-liability claim against it for which the Texas Tort Claims Act (TTCA) waives its immunity. It also argued that Guillen could not demonstrate that a genuine issue of material fact exists on one or more of the essential

3

elements of her cause of action. TXST attached to its plea and motion the following evidence: (1) deposition-transcript excerpts of Guillen and of Estes; (2) Estes's declaration; (3) the affidavits of Wendy R. McCoy, Director of TXST's Environmental Health, Safety, and Risk Management Office, and of Darin Wilde, a lieutenant at TXST's University Police Department; (4) excerpts of the disclosure responses and interrogatory responses of Guillen and of TXST; and (5) the above-reproduced photograph.

To her response to TXST's plea and motion, Guillen attached the following evidence: (1) deposition-transcript excerpts of Estes, of herself, and of her granddaughter; (2) the above-reproduced photograph and another photograph depicting the subject staircase and a second nearby staircase; (3) an invoice from the contractor who in August 2018 replaced the concrete sidewalk at the base on the subject staircase; and (4) the affidavit of Russell Kendzior, President of Traction Experts, Inc. and a "safety expert specializing in slip, trip and fall prevention."

Among other statements, Kendzior averred in his affidavit that he is familiar with "the International Building Code and other codes that pertain to safe egress and stair riser requirements. The International Building Code is a model building code developed by the International Code Council that has been adopted for use as a base code standard by most United States jurisdictions, including Texas." According to Kendzior, the "International Building Code sets minimum safety standards for constructed works, and it informs the standard for safety in Texas and other states. The International Building Code § 1011.5.4 requires stair risers shall be of uniform size and shape. The tolerance between the largest and smallest riser height shall not exceed 3/8 inch in any flight of stairs."

4

**STANDARDS OF REVIEW**

We review de novo the trial court's ruling on TXTS's plea to the jurisdiction. *Sampson v. University of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016). We focus first on the plaintiff's petition to determine whether the facts that were pleaded affirmatively demonstrate that subject-matter jurisdiction exists. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We construe the pleadings liberally in favor of the plaintiff. *Id.* If, as here, a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *See id.* at 227. When the defendant's plea to the jurisdiction challenges the existence of facts supporting an element of the plaintiff's claim and the defendant presents evidence to support its plea, the trial court is required to review the relevant evidence to determine if a fact issue exists. *See id.* This standard "generally mirrors that of a summary judgment," and "by reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of the claim or defense, we preserve the parties' right to present the merits of their case at trial." *Id.*

We review summary judgments de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022). A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). On appeal, the movant still bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

5

**DISCUSSION**

Although TXST is a governmental unit that would typically enjoy immunity from suit, the TTCA expressly waives governmental immunity when certain conditions are met, including relevantly here for premises defects. *See* Tex. Civ. Prac. & Rem. Code §§ 101.021 (governmental unit's liability for injury or death caused by condition or use of tangible personal or real property), .022 (duty owed by governmental unit for premise and special defects), .025 (waiver of governmental immunity); *Sampson*, 500 S.W.3d at 384. In five issues, TXST argues that the TTCA does not waive immunity under the facts alleged and evidence adduced and challenges the trial court's overruling of its evidentiary objections.

***Was the stair condition open and obvious?***

In its first issue, TXST argues that the trial court erred in not finding that Step 14's condition was "open and obvious" such that TXST owed Guillen no duty to warn or make it safe. *See Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 788 (Tex. 2021) ("When the danger is open and obvious, the property owner generally has no obligation to warn of the danger or make the premises safe, as a matter of law."). When a condition is open and obvious, the landowner owes no duty to either licensees or invitees to warn or make the premises safe. *See Dees v. Thomas*, No. 03-18-00372-CV, 2019 WL 2847438, at *4 (Tex. App.—Austin July 3, 2019, no pet.) (mem. op.); *see also Fraley v. Texas A&M Univ. Sys.*, 664 S.W.3d 91, 98 (Tex. 2023) (noting that for special defects, governmental unit owes same duty that private landowner owes invitee; for general defects, governmental unit owes same duty that private landowner owes licensee); *Texas Facilities Comm'n v. Speer*, 559 S.W.3d 245, 250 (Tex. App.—Austin 2018, no pet.) (comparing duties of governmental unit owed to licensees and to invitees).

6

A danger is open and obvious when the evidence conclusively establishes that a person would have "knowledge and full appreciation of the nature and extent of danger," such that "knowledge and appreciation of the danger are considered as proved as a matter of law." *Los Compadres Pescadores*, 622 S.W.3d at 788 (citations omitted). Whether a danger is open and obvious is a question of law determined under an objective test. *Id.* The question is whether the danger is "so open and obvious that as a matter of law [the plaintiff] will be charged with knowledge and appreciation thereof." *Id.* (citations omitted). Under this objective standard, the question is not what the plaintiff subjectively or actually knew but what a reasonably prudent person would have known under similar circumstances. *Id.*

To properly apply an objective test, however, we must consider the "totality of" the "particular" circumstances the plaintiff faced, which necessarily include what the plaintiff was aware of vis a vis the alleged dangerous condition. *See, e.g.*, *id.* (concluding that under particular circumstances alleged, including what plaintiffs were told about whether power line was energized and plaintiffs' knowledge that when conducting prior power-line work for defendant such lines were "always" de-energized, fact that power line was energized and thus dangerous was not open and obvious as matter of law); *Pena v. Harp Holdings, LLC*, No. 07-20-00131-CV, 2021 WL 4207000, at *7–8 (Tex. App.—Amarillo Sept. 16, 2021, no pet.) (mem. op.) (concluding that spiral staircase's pie-shaped steps, lack of handrail on one side, size of handrail on opposite side, and black color were open and obvious especially considering plaintiff's admitted awareness of such attributes and lack of evidence about any improper lighting or concealment of conditions); *Dees*, 2019 WL 2847438, at *4 (including in its analysis of whether stair condition was open and obvious plaintiff's testimony that she had used subject stairs without incident on prior occasions); *see also Osadchy v. Southern Methodist Univ.*,

232 S.W.3d 844, 847 (Tex. App.—Dallas 2007, pet. denied) (affirming summary judgment in favor of defendant when plaintiff's testimony indicated that he had previously entered building using same staircase where accident occurred and had prior knowledge of its alleged condition of excessive riser heights). We thus consider the allegations and evidence pertaining to the circumstances under which Guillen encountered the subject staircase.

Guillen admitted in her deposition that the difference in Step 14's riser height was clearly visible to someone coming up the stairs and looking at the stairwell from the "bottom up," but she testified that it is not visible to someone "coming down" it. When asked whether she was able to see Step 14 before stepping off it, Guillen testified, "I saw the step from the top—only the top of it. You're going in a rhythm going down the stairs." TXST points to no allegation or evidence that Guillen had previously used this staircase or was aware of the disproportionate riser height of Step 14, which the photograph depicts as approximately *twice* the riser height of all the other steps. Nor did TXST produce or identify any evidence depicting the vantage of an ordinary user going down the staircase for the first time, particularly such user's perspective when looking down from Step 14. Vantage is relevant to whether the danger presented by a condition would have been apparent or appreciable to an ordinary, reasonably prudent person. *Cf. City of Austin v. Furtado*, No. 03-21-00083-CV, 2021 WL 6194365, at *4 (Tex. App.—Austin Dec. 31, 2021, pet. denied) (mem. op.) (holding that sunken area of sidewalk was special defect in part because its extent of disrepair was not readily apparent from pedestrian's vantage even though it was apparent had pedestrian been walking in opposite direction).

TXST cites the portions of Guillen's deposition in which she testified that there were no "lighting issues," that it was daytime, and that even though she had been watching the

8

steps as she went down them, she could "not recall" where her "eyes were" when she took the final step onto the sidewalk that resulted in her fall. However, the top surface of each step (i.e., the tread)—including Step 14—and the surface of the sidewalk onto which Step 14 directly terminates appear from the upward-looking photograph to be of a similar if not the same shade of concrete gray. *Cf. Dodson v. Watermark at Timbergate B, LLC*, No. 13-22-00129-CV, 2023 WL 163584, at *2–3 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2023, no pet.) (mem. op.) (crack on curb from parking lot to sidewalk was open and obvious when plaintiff testified that she saw curb while stepping *up* from parking lot and photos showed *two shades of gray* where prior attempts to repair crack had been made and no evidence showed that crack was concealed by either shadow or repair attempts). This observation contrasts with the difference in the two shades of gray of the *riser height* of Step 14, which is easily observable from the perspective at which the above photograph is taken (that is, from the bottom of the staircase looking up) and appears as two distinct horizontal bands of color.[2] But an ordinary, reasonably prudent user of the staircase would be unlikely to appreciate such a large riser-height differential when coming *down* the stairs for the first time, especially considering the similar shades of gray of Step 14's tread and the terminus sidewalk.[3]

TXST also points to the portion of Guillen's testimony in which she stated, "You're going in a rhythm going down the stairs," to support its argument that Guillen was not paying attention or looking at the ground as she took the final step. But such statement does not conclusively prove such contentions, and it is countered by Guillen's testimony that she could

---

[2] In fact, it is such upward perspective that depicts Step 14's riser height as approximately *double* that of all the other steps.

[3] The record does not contain a photograph of the staircase from the downward-looking perspective.

9

"not recall" where her "eyes were" during that final step. The fact that Guillen could not recall where her eyes were at the final moment before her injury and her observation that one gets "in a rhythm" when descending stairs do not mandate a determination that Step 14's disproportionate riser height was open and obvious. Moreover, a person's "getting into a rhythm" when descending a staircase seems quite typical and reasonable, considering that building codes generally allow for only a minimal variance in riser heights, as Kendzior averred:

> I am familiar with the International Building Code and other codes that pertain to safe egress and stair riser requirements. The International Building Code is a model building code developed by the International Code Council that has been adopted for use as a base code standard by most United States jurisdictions, including Texas. The International Building Code sets minimum safety standards for constructed works, and it informs the standard for safety in Texas and other states. The International Building Code § 1011.5.4 requires stair risers shall be of uniform size and shape. The tolerance between the largest and smallest riser height shall not exceed 3/8 inch in any flight of stairs.
>
> The stairs at issue in this lawsuit clearly demonstrate that the last step had a riser height that far exceeded a 3/8 inch difference from every other riser on the staircase of which it formed part.

Such typical uniformity of stair riser-heights is within the common, ordinary experience of people, regardless of whether any particular building-code standards in fact apply to TXST or the subject staircase. An ordinary, reasonable user descending the subject staircase for the first time would be unlikely to expect the large drop-off created by Step 14.

The evidence about Step 14 and the circumstances surrounding Guillen's injury lead us to conclude that Step 14's condition is more like the conditions that courts have determined are not open and obvious as a matter of law than like the conditions that courts have held are open and obvious. *Compare, e.g.*, *Los Compadres Pescadores*, 622 S.W.3d at 788 (energization of overhead power line was not open and obvious when plaintiffs had been

informed by manager that it was de-energized and when lines had previously been de-energized during their work), *and Texas Dep't of Transp. v. Padron*, 591 S.W.3d 684, 704 (Tex. App.—Texarkana 2019, pet. denied) (determining that jury could reasonably have concluded that exceedingly worn and polished portion of road that became unreasonably dangerous and slippery when wet was not open and obvious to motorist travelling at highway speeds), *with, e.g.*, *4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 907, 912 (Tex. 2016) (holding, where undisputed evidence showed that plaintiff and co-worker had worked on same stretch of sidewalk two days earlier without incident, that edge of sidewalk off which co-worker drove forklift was open and obvious), *Corona v. Andy's Car Wash, Inc.*, No. 04-21-00324-CV, 2022 WL 2230945, at *4–5 (Tex. App.—San Antonio June 22, 2022, no pet.) (mem. op.) (large water drain in car-wash bay was open and obvious, where plaintiff testified she had not "remembered" drain was there and had observed that wash water had emptied into drain below car and was not looking down while she walked forward towards drain behind car as it moved forward), *Culotta v. Double Tree Hotels LLC*, No. 01-18-00267-CV, 2019 WL 2588103, at *4 (Tex. App.—Houston [1st Dist.] June 25, 2019, pet. denied) (mem. op.) (low leading edge of two large indoor fountains in middle of restaurant was open and obvious, considering that plaintiff had already successfully navigated onto walkway between fountains and given that sound of running water was present), *and Biggs v. Bradford Mgmt. Co.*, No. 05-17-00869-CV, 2018 WL 3629106, at *3 (Tex. App.—Dallas July 31, 2018, pet. denied) (mem. op.) (skylight on roof of building where plaintiff was cleaning air-conditioning coils and had been thirty times in last four months doing same type of work, and when plaintiff had testified "you can't avoid" seeing skylights, was open and obvious).

We hold that the evidence does not conclusively establish that Step 14's disproportionate riser height was open and obvious, *see Los Compadres Pescadores*, 622 S.W.3d at 788, and we accordingly overrule TXST's first issue.

***Was the stair condition unreasonably dangerous?***

In its second issue, TXST argues that Step 14's condition was not unreasonably dangerous as a matter of law and that the trial court accordingly erred in denying its plea to the jurisdiction. TXST owed Guillen a duty only if Step 14 created an "unreasonably dangerous condition." *See United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800, 802 (Tex. 2022) (landowner owes invitee duty to "make reasonably safe or warn against any concealed, unreasonably dangerous conditions of which [it was], or reasonably should [have been], aware"); *Speer*, 559 S.W.3d at 250 (landowner owes licensee duty "to warn the licensee or make reasonably safe an unreasonably dangerous condition of which the owner has actual knowledge and the licensee does not"). TXST argues that Step 14 was not unreasonably dangerous as a matter of law and that the trial court should have, therefore, granted its plea to the jurisdiction or motion for summary judgment. *See United Supermarkets*, 646 S.W.3d at 802 (recognizing that although whether specific condition is unreasonably dangerous is "ordinarily a fact question," supreme court had held that "some particularly innocuous or commonplace hazards are not unreasonably dangerous as a matter of law"). Examples the supreme court cited in *United Supermarkets* as "particularly innocuous or commonplace hazards" include patches of ice on a sidewalk, a pedestrian ramp, naturally accumulated mud, and a wet floor in front of a self-serve soft-drink display. *See id.* at 803. In *United Supermarkets*, the supreme court similarly determined that a three-quarter-inch divot in the pavement of a parking lot was "profoundly

*ordinary*," did not pose an unreasonable risk of harm, and was not unusual relative to other small pavement defects—"[t]iny surface defects in pavement are ubiquitous and naturally occurring." *Id.* Factors courts may consider in making the "unreasonably dangerous" determination include the condition's size and whether it is clearly marked, whether it had previously caused injuries or generated complaints, whether it substantially differed from conditions in the same class of objects, and whether it was naturally occurring. *Id.*

In contrast to the divot in *United Supermarkets* and the examples cited therein, and viewing the pleadings and evidence in Guillen's favor, as already mentioned Step 14 appears to have a riser height of approximately *twice* that of the other steps on the staircase that is unlikely to be appreciated by a first-time user of the staircase while descending. The shades of concrete do not appear to provide much distinction between Step 14's tread and the sidewalk onto which it terminates. No signs warn users of the disproportionately large drop from Step 14 onto the sidewalk below. While TXST's evidence demonstrates its lack of records of any prior reports of complaints or injuries concerning the staircase, such lack of prior reports does not establish that no prior users of the staircase had trouble navigating the drop from Step 14—it just means that TXST could find no records of any complaints.[4] Furthermore, a disproportionately large step down on an otherwise uniform staircase is not a naturally occurring or ubiquitous defect. Step 14's riser height—twice that of the other steps and significantly greater, without

---

[4] TXST also cites Guillen's granddaughter's testimony that although she and her friends who lived in Lantana Hall were aware of the riser-height difference of Step 14—they "always talked about it" and "it should have been fixed"—she had not had any issues with it and was unaware of anyone reporting it to university officials. However, the granddaughter also testified that she generally used a different staircase at the front of Lantana Hall because it was closer to the students' parking garage and that when she did take the subject staircase, it was "a good step to get up there [onto Step 14]." The granddaughter had not mentioned Step 14's condition to Guillen. After Guillen's injury, Lantana Hall RA's or other university-employed students "started putting signs right there, like, 'watch your step.'"

warning, than what a person descending the stairs for the first time would expect—is not a commonplace or innocuous hazard. We refuse to hold as a matter of law that Step 14 is not unreasonably dangerous as on this record such determination is for the factfinder. We accordingly overrule TXST's second issue.

### *Does TTCA Section 101.061 deprive the trial court of jurisdiction?*

In its third issue, which it did not raise below, TXST argues that Section 101.061 of the TTCA deprived the trial court of jurisdiction because the "uncontested record shows that . . . the staircase . . . was constructed in 1961" and TXST "has no record of modifications to the staircase" prior to Guillen's injury.[5] *See* Tex. Civ. Prac. & Rem. Code § 101.061 ("This chapter does not apply to a claim based on an act or omission that occurred before January 1, 1970."). When a party alleges waiver of immunity based on a condition or use of real property, the governmental unit is entitled to immunity under this exclusion if it can prove (1) that the structure was completed before January 1, 1970; and (2) that the structure has remained in the same condition since that time. *Smith v. Galveston County*, 326 S.W.3d 695, 698 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see Chapman v. City of Houston*, 839 S.W.2d 95, 99 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("The appellate courts that have addressed this question have stated that where claims concern a structure constructed prior to the [TTCA], the state has governmental immunity."); *see also Board of Regents v. Steinbach*, No. 03-14-00326-CV, 2015 WL 7694857, at *9–10 (Tex. App.—Austin Nov. 24, 2015, no pet.) (mem. op.) (concluding that TXST was immune to premise-liability claims based on original design of stairs

---

[5] Although TXST did not raise this issue with the trial court, arguments asserting lack of subject-matter jurisdiction may be raised for the first time on appeal. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).

that were constructed before 1970 and unmodified since then); *Barron v. Texas Dep't of Transp.*, 880 S.W.2d 300, 302 (Tex. App.—Waco 1994, writ denied) (defining "maintenance" as "that which is required to preserve the [public work] as it was originally designed and constructed" and concluding that immunity was not waived for condition of bridge constructed in 1920s that had not changed since then and that alleged failure to make safety upgrades was protected by discretionary-function exception).

While the allegations and record support TXST's contention that it had not made modifications to the staircase between the respective dates of its construction and Guillen's injury, the dispositive query is not whether the governmental unit made modifications to the structure but whether the structure remained in the same condition. *See Smith*, 326 S.W.3d at 698. Guillen's claim is based in part on TXST's alleged failure to maintain the staircase in its original condition and its alleged negligent upkeep of the staircase. In other words, the "act or omission" about which she complains is not TXST's construction of the staircase in the first instance but its failure to repair it after it became unsafe when the sidewalk onto which Step 14 terminates allegedly sank several inches, according to Estes's testimony. *Cf.* Tex. Civ. Prac. & Rem. Code § 101.061 (referring to "claim based on an act or omission" that occurred before 1970). Guillen does not dispute that the staircase was constructed before 1970 but identifies evidence that it has not remained in its original condition since its construction: Estes's testimony that the reason Step 14 is "about double the size of Step 13" is because "the ground below it contracted and lowered and allowed the sidewalk [onto which Step 14 terminates] to lower." Although Estes testified that TXST was aware prior to Guillen's injury that the sidewalk had sunk downwards, the university "had no response" to that knowledge because the sidewalk

15

itself was "nice and level" and "didn't in [Estes's] opinion create a trip hazard." No evidence in the record indicates when the downward sinking occurred.

Estes further elaborated in his testimony, in answer to a query about whether Step 14's riser height was the same when Guillen fell as it was when the staircase was constructed, "[I]t appears that the sidewalk has sunk. It's lowered. So, *it was not installed at that height*. My . . . assumption is that it was installed a little higher, which is probably indicative of the color change [i.e., the two distinct horizontal color bands on the riser of Step 14]." (Emphasis added.) Estes's understanding, based on his "personal observation," is that the staircase as well as the sidewalk onto which it terminates are "all original construction, all installed together as one piece." Estes testified that after Guillen's injury, TXST "reinstalled the . . . sidewalk at a higher level." He provided the reason for its reinstallation:

> There was a problem in the surface level of the sidewalk about 20 feet away from these stairs that we observed and thought was a trip hazard and we wanted to address. And, so, rather than going in and just doing this section in the middle, we went ahead and extended it all the way to the base of the staircase because it would look better and then it would also raise that back up and delay any potential further settling that might create a hazardous condition in the future.

He averred that it was purely an "aesthetic and proactive" decision to raise the level of the sidewalk surface to reduce Step 14's rise. That work was performed three months after Guillen's injury, at Estes's request, and the work order for the company that performed the repair was attached to TXST's plea and motion. Estes testified that he had measured (with a tape measure) the height of Step 14's rise after Guillen's injury, but he did not have the paperwork with him at the deposition and could not remember its height, but he agreed that it was "several inches"

16

more than the riser height of Step 13. After "thinking about it," Estes corrected himself: "Yeah, there are—there were several—a few inches difference."[6]

We conclude that TXST has not established that the staircase—specifically Step 14's height above the terminus sidewalk—remained in the same condition between when it was constructed and Guillen's injury, and there is no evidence in the record that the change in Step 14's height occurred before 1970, precluding TXST from meeting its burden to prove that Section 101.061 removes Guillen's claims from the waiver of TXST's immunity provided under the TTCA. *See* Tex. Civ. Prac. & Rem. Code § 101.061; *Smith*, 326 S.W.3d at 698. We overrule TXST's third issue.

### Does TTCA Section 101.056 preserve TXST's immunity?

In its fourth issue, TXST argues that its decision not to modify Step 14's riser height was a "discretionary decision" for which Section 101.056 of the TTCA expressly preserves its immunity. That section, often referred to as the "discretionary function exception," *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 665 (Tex. 2019), provides,

This chapter does not apply to a claim based on:

(1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or

(2) a governmental unit's decision not to perform an act or on its own failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

---

[6] Later in his deposition, Estes testified that he did not learn about Guillen's injury and complaint about the staircase until *five* months after the incident. This conflicts with his testimony that (1) he measured Step 14's riser height *after* Guillen's injury and found a few or several inches of height differential between it and the previous step and (2) the sidewalk repair occurred only *three* months after Guillen's injury, which would make it impossible for him to have measured Step 14's rise as Guillen encountered it.

Tex. Civ. Prac. & Rem. Code § 101.056. The supreme court has held that this provision not only preserves immunity for discretionary actions by a governmental unit but also "for the state's failure to act, when no particular action is required by law." *See Johnson*, 572 S.W.3d at 665 (quoting *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 657 (Tex. 2007)). This discretionary-function exception "avoid[s] judicial review or interference with those policy decisions committed to the other branches of government." *Flynn*, 228 S.W.3d at 657.

The question relevant to determining whether questioned conduct involves a protected "discretionary" decision by a governmental unit asks whether the decision is a policy-level one or an operational-level one. *See Johnson*, 572 S.W.3d at 665. Policy-level decisions are those pertaining to the design of a public work or the formulation of a policy; operational-level decisions pertain to the maintenance of a public work or the negligent implementation of a policy. *See Flynn*, 228 S.W.3d at 657. For example, a governmental unit's design of a bridge without lighting is a protected policy-level decision while its failure to maintain the lighting on a bridge that is designed to be illuminated is an operational-level action that is generally not protected by immunity. *Id.* at 657–58. Similarly, a water district's decision to release water from a spillway constitutes policy formulation for which the district is immune, but its subordinate decision of determining the volume of the outflow from the spillway is policy implementation for which the district is not immune. *Id.* at 657 (concluding that university's decision to install sprinklers was protected policy-formulation decision but its decisions of when and where they will spray were operational- or maintenance-level decisions that "fall outside the scope of the discretionary powers exception").

In support of this issue, TXST cites Estes's testimony in which he averred that he did not consider Step 14's rise or any portion of the subject staircase unreasonably dangerous or

18

in need of modification: "No one had reported it as a problem. I had not noticed a problem myself in my travels to and from [Lantana Hall]," even though "I regularly use that staircase," including prior to Guillen's injury. Although he was "sure" that as he regularly went up or down the staircase he had "noticed there was a difference" in the riser height of Step 14, he did not feel it needed to be repaired because he "didn't feel like the height difference at the time created a significant hazard." He acknowledged that riser heights "come in a variety of sizes" and that "[i]f they become excessive, then they can become a hazard." When pressed, Estes could not provide a "specific number" for a riser-height differential that he would deem unsafe and excessive.

When explaining the decision to install a new step on a *different* staircase that had a riser-height differential that Estes felt was "excessive," he could not remember the specific number of inches for the differential of that staircase. He testified that the method he used to determine that the other staircase's riser-height differential was excessive but that Step 14's differential was not excessive was by "feel": "Difference to me when I walked out one versus the other was one felt unsafe; the other one did not," and "I felt awkward transitioning from one level to the next [when using the other staircase]." TXST additionally cites the portion of Estes's testimony in which he avers that, as Director of Housing and Facilities Services, he has the authority to initiate those construction projects, repairs, and modifications at TXST that he deems appropriate.

The relevant query for determining whether a decision is a policy-level one (and thus falls under the discretionary-function exception) or is an operational- or maintenance-level one (and thus does not fall under the exception) does not ask whether the employee of the governmental unit is authorized—by law, by his position, or otherwise—to exercise discretion in

19

deciding whether conditions are unreasonably dangerous or whether and when to make repairs and conduct maintenance. It asks what *type* of decision is at issue: one that involves the design of public works or the formulation of official policy or one that involves how or when maintenance of that public work is conducted or how or when the policy is implemented. *See Johnson*, 572 S.W.3d at 665; *Flynn*, 228 S.W.3d at 657. The decision at issue here—to not repair or modify Step 14's disproportionate riser height—is of the latter type. Accordingly, it is not protected under the discretionary-function exception, *see* Tex. Civ. Prac. & Rem. Code § 101.056; *Johnson*, 572 S.W.3d at 665; *Flynn*, 228 S.W.3d at 657. We overrule TXST's fourth issue.

### *Did the trial court err in overruling TXST's evidentiary objections?*

In its final issue, TXST contends that the trial court erred in overruling the following objections to Guillen's evidence: (1) the portion of Kendzior's affidavit in which he averred that the condition of Step 14 is "a dangerous condition that posed an unreasonable risk of harm" to Guillen because such statement constitutes a legal conclusion; (2) the portion of Kendzior's affidavit in which he averred that (a) a "person making ordinary use of the staircase is unlikely to expect a severely different riser height from one step to the next"; (b) the difference in height is "very difficult if not impossible to see and appreciate when coming down the staircase" because only the "top of the step is visible"; and (c) the riser-height differential is "unlikely to be understood by a user of the staircase coming down" because the statements are conclusory and speculative; and (3) the portion of Estes's deposition in which he averred that TXST must comply with "regulations regarding riser heights" because it is a legal conclusion

20

and was in answer to an objected-to, overly broad and ambiguous question that did not specify any particular regulations.

We need not address these evidentiary complaints, however, because we do not rely on the subject evidence in arriving at our holding and because it is not necessary to our dispositive determinations. Therefore, even if the trial court erred in admitting the evidence, such admission was harmless. *See* Tex. R. App. P. 44.1(a) (harmless-error rule). We overrule TXST's fifth issue.

## CONCLUSION

Having overruled TXST's issues, we affirm the trial court's order denying TXST's plea to the jurisdiction and motion for summary judgment.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: January 4, 2024

21